## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

### CASE NO.: 1:16-CV-21273-RNS

**GEORGE KIRSHAM HARRIS,**
**LUXON LUBORIEUX, ARTURO**
**LACAYO, and ERIC GAMARRA,**

      **Plaintiffs,**

**v.**

**SWISSPORT SA, LLC f/k/a SERVISAIR LLC,**
**a Delaware limited liability company, SWISSPORT**
**CARGO SERVICES, L.P., a California limited**
**Partnership,**

      **Defendants.**

_____/

### DEFENDANTS' MOTION FOR SUMMARY FINAL JUDGMENT
### AND SUPPORTING MEMORANDUM OF LAW

The Defendants, SWISSPORT SA, LLC, f/k/a SERVISAIR LLC ("Swissport SA") and

SWISSPORT CARGO SERVICES, LP ("Swissport Cargo") (all Defendants collectively

referred to as the "Defendants"), pursuant to Fed. R. Civ. P. 56, Local Rule 7.1, and the Court's

Amended Scheduling Order, dated September 28, 2016 (ECF No. 25), hereby move the Court for

entry of summary final judgment in their favor and against the Plaintiffs in this action, LUXON

LABORIEUX ("Laborieux"), ARTURO LACAYO ("Lacayo"), and ERIC GAMARRA

("Gamarra") (all Plaintiffs collectively referred to as the "Plaintiffs").   As grounds for their

Motion, the Defendants state as follows:

1.      In their Second Amended Complaint ("Compl.") Plaintiffs allege the Defendants

have violated the Fair Labor Standards Act (the "FLSA"), 29 U.S.C. §201 *et seq*, and seek an

award of compensatory and liquidated damages, and attorneys' fees and costs. (Compl. ¶¶ 25, 31).

2.     Specifically, Laborieux and Lacayo allege that, while employed by Swissport SA at the Miami International Airport ("MIA" or the "Airport"), they worked approximately 50 to 60 hours per week and, for those hours in excess of 40, were compensated at a rate of less than one and one half times the regular rate at which they were employed. (Compl. ¶¶ 21-22).

3.     Gamarra alleges that, while employed by Swissport Cargo at the Miami International Airport ("MIA" or the "Airport"), he worked more than 40 hours per week, and, for those hours in excess of 40, was compensated at a rate of less than one and one half times the regular rate at which he was employed. (Compl. ¶¶ 27-28).

4.     As set forth in this Motion, Plaintiffs fit squarely within the FLSA's executive exemption, as described by applicable U.S. Department of Labor ("DOL") regulations, in that: (1) they each earned a salary above the applicable threshold; (2) Laborieux and Lacayo's primary duty was the management of fueling operations during their shifts, while Gamarra's primary duty was the management of cargo operations during his shift; (3) all three customarily and regularly directed the work of two or more full-time employees, and (4) they each made recommendations regarding discipline of employees that were relied upon by their supervisors.

5.     Moreover, Plaintiffs meet the requirements of the FLSA's administrative exemption, as described by applicable DOL regulations, in that they each earned a salary above the applicable threshold, their primary duty was the performance of office or non-manual work directly related to Defendants' management or general business operations and included the exercise of discretion and independent judgment with respect to matters of significance.

6.      Thus, there is no genuine issue as to any material fact with respect to Plaintiffs' claims, and Defendants are entitled to entry of a judgment in their favor as a matter of law.

**WHEREFORE,** Defendants respectfully request the Court to grant summary final judgment in their favor and against Plaintiffs, award Defendants their taxable costs incurred in connection with this matter, and grant such other relief the Court deems just and proper.

## MEMORANDUM OF LAW

## I.      THE DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT BECAUSE THE PLAINTIFFS QUALIFY AS EXEMPT EXECUTIVES UNDER THE FLSA.

The FLSA requires that an employee receive minimum wages for all hours worked and overtime pay if he or she works more than forty hours in a week.  29 U.S.C. §§ 206(a), 207(a)(l). The statute, however, exempts from these requirements "any employee employed in a *bona fide* executive . . . capacity."  29 U.S.C. § 213(a)(l).  The DOL has promulgated regulations that further describe and interpret the scope of this exemption.  Specifically, the DOL's regulations provide that an employee qualifies as an executive if:

(1)      He is compensated on a salary basis at a rate of at least $455 per week;

(2)      His primary duty is management of the enterprise or a customarily recognized department or subdivision of the enterprise;

(3)      He customarily and regularly directs the work of two or more other employees; and,

(4)      He has the authority to hire or fire other employees or his suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

29 C.F.R. § 541.100(a).

### A.      Plaintiffs Were Paid A Salary Of At Least $455 Per Week.

To qualify as a *bona fide* executive, an employee must receive a salary of at least $455 per week.  29 C.F.R. § 541.100(a)(1).  The salary cannot be subject to reduction because of

variations in the quality or quantity of the work performed. 29 C.F.R. § 541.602. It is undisputed that at all times relevant to their claims, Plaintiffs were paid a salary of more than $455 per week.[1] (Statement of Material Facts ("SOF") (ECF No. 45), filed herewith, at ¶¶ 3, 6, 31). Plaintiffs received this amount every week, regardless of how many hours they worked. (SOF ¶¶ 3, 6, 31). Plaintiffs' salaries, thus, meet the above-mentioned first prong of the executive exemption.

### B.     The Plaintiffs' Primary Duty Was Management.

#### 1.     The Plaintiffs Performed Management Tasks.

The DOL's regulations provide a list of "management" activities. 29 C.F.R. § 541.102(b). As set forth below, all three Plaintiffs regularly performed many of these management duties.

*Lacayo and Laborieux:* As Duty Managers, Lacayo and Laborieux had control over the entire operation, and were responsible for "direct[ing] the work force" (SOF ¶ 8.) Indeed, Lacayo admitted that, as a Duty Manager, he was responsible for: "the day-to-day safe and efficient operation of plane fueling activities;" ensuring contractual and customer services were met; "manag[ing] and direct[ing] staff in the effective execution of their duties and the assistance in solution of problems;" "enforc[ing] company and airline safety, health policies and procedures;" ensuring compliance with airport authority rules and U.S. Customs; ensuring proper fuel inventories were met; ensuring "the safe and efficient use of fueling equipment, including computer systems and radios, as well as the maintenance of such;" making sure operational

---

[1] Lacayo testified that, while he was a Fueler (an hourly position), he never worked off the clock, and that he is not claiming overtime for weeks in which he was employed as a Fueler. (SOF ¶ 5.) Lacayo, therefore, has no overtime claim for the timeframe during which he worked as a Fueler.

reports were timely completed; completing accident reports; auditing Fuelers, which entailed checking to see if they were connected properly, wearing safety equipment, and correctly doing their paperwork; ensuring that scheduled Fuelers appeared for work; managing the staff; liaising with the police or fire department if there was an issue with a Fueler; and following up on customer requests and establishing a line of communication.  (SOF ¶ 10.)

Moreover, Laborieux trained Lacayo when Lacayo became a Duty Manager.  (SOF ¶ 7.) While Laborieux trained Lacayo, he was performing the same duties Lacayo admitted that he performed as a Duty Manager, including attempting to fix any problems, calling maintenance about mechanical issues, checking the roster for employees on the shift, and doing an end of shift report.  (*Id.*)

As set forth in the record, Duty Managers had to create and disburse shift reports at the end of every shift.  (SOF ¶¶ 7, 13.)  Notably, Fuelers, Lead Fuelers, and Dispatchers did not have to fill out operational reports.  (SOF ¶ 13.)  In the shift reports, Duty Managers would state "what the next manager needs to know," including if there were delays, what equipment was out of service, who the next customer to be serviced was, and shift turnover.  (*Id.*)  The reports also included information regarding accidents or spills, whether an airline complained, if employees were absent, and if any employees called out.  (*Id.*)  The purpose of the report was to notify everyone of any issues on the shift, which included letting them know if there were problems with the airlines, and how they transpired.  (*Id.*)

Laborieux and Lacayo both admitted to enforcing company and airline safety, health policies and procedures.  (SOF ¶¶ 10, 14.)  Indeed, both Laborieux and Lacayo performed safety audits on employees, in which they made sure employees were following procedure and were doing what they were supposed to be doing.  (SOF ¶ 14.)

Duty Managers were responsible for making sure there was adequate coverage and that their employees had the correct resources, with respect to both personnel and equipment (SOF ¶ 20), as well as following up on the status of equipment and equipment serviceability (SOF ¶¶ 7, 10, 13, 20, 25, 26, 29), and liaising with customers.  (SOF ¶¶ 10, 11, 15, 23, 24.)  Specifically, Duty Managers "were responsible for all clients" that Swissport SA serviced.  (SOF ¶ 11.)  This included following up on customer requests and establishing a line of communication.  (SOF ¶ 10; *see* SOF ¶ 15.)   Duty Managers, therefore, would get involved with a client if there were issues that needed to be resolved.  (SOF ¶ 11.)  Indeed, Laborieux was disciplined for failing to respond to a customer.  (SOF ¶ 15.)  Moreover, while the Fuelers were fueling planes, Laborieux was answering phone calls from customers, and spent all day responding to issues.  (SOF ¶ 23.) Meanwhile, Lacayo directly communicated with Swissport SA's customers, about their needs, which he would then attempt to fulfill.  (SOF ¶ 23.)  In fact, Lacayo attended a conference call with at least one client twice a day, every day.  (*Id.*)  On a typical day, Lacayo spent approximately an hour to an hour and fifteen minutes interacting with customers.  (*Id.*)

Perhaps most indicative of the responsibilities of Swissport SA's Duty Managers—other than the Plaintiffs' current resumes, which indisputably demonstrate they were exempt executives—is the written reprimand Laborieux received for failing to fulfill some of his supervisory duties.  For example, Laborieux, who was supposed to be "aware if everything that takes place during his shift," was disciplined for failure to do his job because there was no Fueler covering a flight one day, because he failed to follow up with a customer another day, and because he failed to do the requisite number of audits, which were a way to ensure compliance with fueling and safety procedures.  (SOF ¶ 15.)  In sum, such discipline, coupled with the

Plaintiffs' own acknowledgments, demonstrates that Duty Managers were held accountable for what was occurring during their shifts.

Duty Managers brought payroll discrepancy issues, including whether they knew the employee did or did not actually work the hours the employee claimed to have worked and if employees were paid the correct rate, to Cabrera's attention. (SOF ¶ 27.) Duty Managers and Cabrera were responsible for making sure that overtime did not go over budget. (*Id.*) Notably, Duty Managers had the ability to approve overtime prior to reporting it. (*Id.*) In fact, Duty managers signed a checklist where employees designated the time they arrived and the time they left work, as well as if they did not take a meal break. (SOF ¶ 28.) Lacayo would check to see if the employee had overtime or did not take a lunch, and then would sign the checklist. (*Id.*) As a Duty Manager, Lacayo would make sure there were no discrepancies between what the employee reported on the checklist and the employee's scheduled shift. (*Id.*) If the checklist was not signed, the Fueler would not be paid. (*Id.*) If the Duty Manager did sign it, the Fueler would be paid. (*Id.*)

*Gamarra*: As the Cargo Supervisor working the night shift, Gamarra was the highest-ranking employee, as no other managers or supervisors worked the night shift with him. (*See* SOF ¶ 32.) Gamarra, like the Duty Managers, was responsible for completing shift reports, in which he explained what happened on his shift, including if he had no manpower or no equipment. (SOF ¶ 33.) He completed the shift reports on a daily basis. (*Id.*) Moreover, Gamarra was responsible for reporting any irregularities, service failures, incidents or accidents during his shift. (*Id.*) Additionally, Gamarra was responsible for controlling staff assignments and managing employee compensation, maintaining "safety, security, and quality standards," and

maintaining good relationships with Swissport Cargo's customers as well as airport authorities. (SOF ¶ 30.)

As a supervisor, Gamarra communicated with Swissport Cargo's customers. (SOF ¶ 34.) Notably, in addition to providing rollover reports to the General Manager, Gamarra was responsible for providing the report to Swissport Cargo's customer. (*Id.*)

Additionally, Gamarra had the ability to approve overtime. (SOF ¶ 35.) Gamarra signed payroll exception forms filled out by employees. (*Id.*) As with the Duty Managers on the fueling side, if Gamarra did not sign the payroll exception form, the employee would not receive overtime. (*Id.*)

The above-described facts – based in large part on Plaintiffs' own admissions – demonstrate the managerial nature of their positions. *See Brillas v. Bennett Auto Supply, Inc.*, 675 F. Supp. 2d 1164, 1169 (S.D. Fla. 2009) (internal citations omitted) ("Cases applying 29 C.F.R. § 541.700 (2004) hold that assistant managers are exempt so long as they perform some management tasks."); *see also Byers v. Petro Servs., Inc.*, 110 F. Supp. 3d 1277, 1282 (S.D. Fla. 2015) (finding employee's, who stated he was "in charge" of the store, primary duty was management where employee's duties included, among other things: making sure employees he supervised were properly trained; assigning, directing, and monitoring the quality of other employees' work; disciplining employees; and, making sure store had supplies of merchandise); *Moore v. Tractor Supply Company,* 352 F. Supp. 2d 1268, 1275 (S.D. Fla. 2004) (granting summary judgment on executive exemption where, among other things, plaintiff's own deposition testimony demonstrated the managerial nature of his position); *Donovan v. Burger King Corp.*, 672 F. 2d 221, 226 (1st Cir. 1982) ("*Burger King I*") (recognizing supervision of other employees is clearly a management duty and "[e]nsuring that company policies are carried

out constitutes the very essence of supervisory work") (internal quotations omitted). Indeed, Lacayo recognized the managerial nature of the Duty Manager position by acknowledging his duties included "running an effective and safe operation" and "supervision of crews to be able to run an effective operation." (SOF ¶ 29.) Laborieux similarly recognized the managerial nature of his position when he acknowledged he was "[r]esponsible for the supervision and operations for the Fuelling Division at [MIA]," "[s]upervis[ing] approximately one hundred (100) employees," "[c]ommand[ing] and deploy[ing] subordinate personnel," and "[e]valuat[ing] employee performance." (SOF ¶ 4.) *See Calvo v. B & R Supermarket, Inc.*, 63 F. Supp. 3d 1369, 1382 (S.D. Fla. 2014) (finding assistant grocery store manager who "oversaw and ensured that those employees were properly assigned to necessary tasks and were attending to their responsibilities" an exempt executive); *Jackson v. Advance Auto Parts, Inc.*, 362 F. Supp. 2d 1323, 1335 (N.D. Ga. 2005) (finding assistant managers exempt in part because while they were performing incidental tasks, they were still "overseeing the other employees" and "making sure that the store was operating properly"). Plaintiffs, thus, were involved in "management" duties.

## 2. Performing Management Tasks Was The Plaintiffs' Primary Duty.

The term "primary duty" means the "principal, main, major, or most important duty that the employee performs." 29 C.F.R. § 541.700(a). "Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole." *Id.* The factors to consider in the analysis include, but are not limited to: (1) the amount of time spent performing exempt work; (2) the relative importance of the exempt duties as compared with other types of duties he performs; (3) the employee's relative freedom from direct supervision; and (4) the relationship between the employee's salary

and the wages paid to other employees for the kind of nonexempt work performed by the employee.  *Id.*

Laborieux generally alleged during his deposition that he spent a substantial amount of time on non-exempt tasks such as troubleshooting and fueling; Lacayo alleged he spent most of his time resolving issues; and Gamarra alleged he spent a substantial portion of his time doing the same thing the other cargo employees were doing.  These arguments are unavailing.  Even if the Plaintiffs' claims were true, the nature of the work they did and the way in which they did it clearly demonstrate their primary duty was management.  While the amount of time an employee spends performing nonexempt work can be considered in evaluating his primary duty, it "is not the sole test, and nothing . . . requires that exempt employees spend more than 50 percent of their time performing exempt work."  29 C.F.R § 541.700(c).

Defendants assert that Plaintiffs spent significantly less time performing non-managerial work than they claim; however, for purposes of this Motion, that dispute is immaterial.  Even if Plaintiffs did spend a considerable portion of their day performing non-managerial work, that fact would not preclude a finding that management was their primary duty.  Case law is replete with decisions holding managers and assistant managers exempt even where they spent the vast majority of their time performing manual tasks.  *See, e.g., Moore*, 352 F. Supp. 2d at 1274-75 (store manager exempt despite spending 95% of his time performing nonexempt tasks); *Jones*, 69 Fed. Appx. at 637 (manager exempt though she claimed to spend 75-80% of her time performing basic line-worker tasks); *Baldwin v. Trailer Inns, Inc.*, 266 F.3d 1104, 1113 (9th Cir. 2001) (managers exempt despite claiming to spend 90% of their time performing nonexempt work); *Murray v. Stuckey's,  Inc.*, 939 F.2d 614, 618-20 (8th Cir. 1991) (managers exempt though they claimed that up to 90% of their time was spent performing non-managerial duties);

*Jackson*, 362 F. Supp. 2d at 1334 (assistant managers exempt despite contending they spent 90% of their time performing nonexempt tasks); *Kastor v. Sam's Wholesale Club*, 131 F. Supp. 2d 862, 866-67 (N.D. Tex. 2001) (bakery manager exempt though he claimed to spend up to 90% of his time performing the same work as the hourly employees); *Haines v. Southern Retailers, Inc.*, 939 F. Supp. 441, 450 (E.D. Va. 1996) (store manager exempt despite spending up to 90% of her time performing non-managerial duties).

For instance, in *Langley v. Gymboree Operations, Inc.*, this District held a manager was exempt from overtime pay under the FLSA. 530 F. Supp. 2d 1297 (S.D. Fla. 2008). The *Langley* manager provided for the safety of the property or the employees, provided customer service, was responsible for the store's success, explained goals to her associates, and ensured safety standards were met. *Id.* at 1302. Despite claiming she spent more than half her time on the sales floor performing non-exempt work, the Southern District found the plaintiff was exempt because she performed managerial tasks simultaneously with non-managerial tasks. *Id.*

Like the *Langley* plaintiff, Lacayo and Laborieux enforced airline and company safety and health policies (SOF ¶¶ 10, 14), provided customer service (SOF ¶¶ 10, 11, 23, 24), were responsible for ensuring flights went out on time (SOF ¶ 25), and for explaining safety issues (SOF ¶¶ 10, 14, 16) and disciplinary problems (SOF ¶¶ 19-21) to employees. Similarly, Gamarra was responsible for "controlling of staff assignments and compensation management," "maintain[ing] safety, security and quality standards," and "[m]aintain[ing] good relations with [Swissport Cargo's] customer[s] and airport authorities." (SOF ¶ 30.)

Thus, even though the Plaintiffs may allege they spent much of their time performing nonexempt work, management was still their primary duty because their "managerial functions were critical to the success" of the company. *See Langley*, 530 F. Supp. 2d at 1302. "[O]ne can

still be 'managing' if one is in charge, even while physically doing something else[.]" *Burger King I*, 672 F.2d at 226. Here, Laborieux alleged he spent a large portion of his time fueling planes.[2] (*See* Laborieux Dep. 82:19-83:9). Laborieux also testified, however, that while he was a Duty Manager he was responsible for making sure the employees were doing what they were supposed to be doing (SOF ¶ 16); handling customer issues (SOF ¶¶ 11, 23); making sure flights are assigned (SOF ¶ 25); making sure flights departed on time (*id.*); ensuring employees had their equipment and that they were wearing their safety equipment (SOF ¶¶ 16, 22); confirming the employees get on the ramp and start fueling (SOF ¶ 22); and coaching employees by demonstrating better ways to perform their jobs if they were doing something wrong (*id.*).

Lacayo testified that he spent approximately 90 percent of his day checking for issues. (SOF ¶ 26.) He also testified that Duty Managers were responsible for: ensuring contractual and customer services were met; "manag[ing] and direct[ing] staff in the effective execution of their duties and the assistance in solution of problems;" "enforc[ing] company and airline safety, health policies and procedures;" ensuring compliance with airport authority rules and U.S. Customs; ensuring proper fuel inventories were met; ensuring "the safe and efficient use of fueling equipment, including computer systems and radios, as well as the maintenance of such;" making sure operational reports were timely completed; completing accident reports; auditing Fuelers, which entailed checking to see if they were connected properly, wearing safety equipment, and correctly doing their paperwork; ensuring that scheduled Fuelers appeared for work; managing the staff; liaising with the police or fire department if there was an issue with a Fueler; and following up on customer requests and establishing a line of communication. (SOF

---

[2] An allegation seemingly contradicted by his co-Plaintiff, Lacayo's, testimony. (*See* SOF ¶ 7.)

¶ 10.)   Therefore, although the Plaintiffs may have spent a large amount of time performing nonexempt work, management was still their primary duty because it was the most significant part of their job.  *See Burger King I*, 672 F.2d at 226-27; *Burger King II*, 675 F.2d at 520-21.

Moreover, a strict time division is particularly misleading because, as here, one can still be managing if one is in charge, even while physically doing something else.  *Burger King I*, 672 F.2d at 226-27.   Indeed, the DOL's regulations specifically contemplate that an employee can concurrently perform exempt and nonexempt work.   29 C.F.R. § 541.106(a).   "Generally, exempt executives make the decision regarding when to perform nonexempt duties and remain responsible for the success or failure of business operations under their management while performing the nonexempt work.   In contrast, the nonexempt employee generally is directed by a supervisor to perform the exempt work or performs the exempt work for defined time periods." *Id.*

Importantly, the Plaintiffs were held accountable for issues occurring during their shifts regardless of the tasks they were performing.   For example, while Laborieux may have been fueling, he continued to be responsible for making sure employees were doing their jobs correctly (SOF ¶¶ 14, 16), as indicated by the written reprimand he received for failing to do his job when he failed to have flight covered one day.   (SOF ¶ 15.)   Lacayo represented that, as a Duty Manager for Swissport SA, his "[d]uties include[d] running an effective and safe operation" and "[s]upervision of crews to be able to run an effective operation."   (SOF ¶ 29.) While Gamarra was on shift as a Cargo Supervisor, he controlled staff assignments and maintained safety, security, and quality standards.   (SOF ¶ 30.)  The Plaintiffs' own testimony, therefore, demonstrates they were performing exempt managerial work concurrently with any non-managerial work.

As far as the difference in the amount of compensation between Duty Managers and Fuelers, the record shows that Lacayo and Laborieux received approximately thirty-three percent (33%) more thank Fuelers in their compensation as Duty Manager (from approximately $14.27 per hour – or approximately $30,000 per year – to a salary of at least $40,000 per year).  (SOF ¶¶ 3, 6, 31.)  Similarly, Gamarra made over $40,000 per year (at least $800 per week), whereas a Lead in cargo would make approximately $15.10 per year.  (*See* SOF ¶ 32.)

Thus, while the Plaintiffs may dispute that management was not their primary duty because they claim to have spent the majority of their time on nonexempt tasks, the regulations and applicable case law clarify that performance of these duties, in conjunction with overall supervision and management, is not contrary to the exemption's application.  In fact, the allegation that Laborieux and Lacayo were responsible for "troubleshooting," proves indicative of their responsibilities, as managers, to ensure the ongoing success of the Swissport SA's operation.  The Plaintiffs satisfy the second prong of the executive exemption because their primary duty remained management.

## C.    The Plaintiffs Customarily And Regularly Directed The Work Of Two Or More Employees.

A *bona fide* executive must customarily and regularly direct the work of two or more other employees.  29 C.F.R. § 541.100(a)(3).  As Duty Managers, Lead Fuelers, Dispatchers, and Fuelers reported directly to Laborieux and Lacayo.  (SOF ¶ 12.)  Specifically, Duty Managers regularly supervised approximately twenty Fuelers, one Lead Fueler, and one Dispatcher on any given shift.  (*Id.*)  Notably, only one Duty Manager worked per shift.  (SOF ¶ 9.)  Gamarra supervised at least 2 employees during his shifts.  (SOF ¶ 32.)

Thus, the third prong of the executive exemption is satisfied.

**D.     The Plaintiffs' Recommendations Concerning Changes Of The Status Of Other Employees Were Given Particular Weight.**

A *bona fide* executive must have the authority to hire or fire other employees or the executive's suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change in of status of other employees must be given particular weight.  29 C.F.R. §41.100(a)(4).   "An employee's suggestions and recommendations may still be deemed to have 'particular weight' even if a higher level manager's recommendation has more importance, and even if the employee does not have authority to make the ultimate decision as to the employee's change in status." 29 C.F.R. § 541.105.

Plaintiffs undeniably had the authority to initiate the disciplinary process against hourly employees.   While Laborieux and Lacayo attempted to deny their responsibilities by stating Cabrera drafted the disciplinary actions (which Cabrera denies), the disciplinary process against the Duty Managers' subordinates was precipitated by a Duty Manager providing the information to Cabrera.  (*See* SOF ¶¶ 11, 16, 18, 19.)  Indeed, Laborieux and Lacayo admitted during their depositions that they would report employees to their supervisor, who would then tell them how to write up the disciplinary forms for the employees based on the information they provided to the supervisor.  (*See* SOF ¶ 19.)   Laborieux and Lacayo were also responsible for administering discipline and counseling to employees.   (SOF ¶¶ 19-21.)   Importantly, Laborieux's and Lacayo's supervisor could not have known about the misconduct of their subordinates without them notifying him.   (SOF ¶ 19.)   Laborieux and Lacayo, who provided the information to Cabrera, therefore, had the ability to determine the information conveyed to Cabrera and ultimately used for an employee's discipline.   Moreover, Laborieux specifically represented on his resume that, as a Duty Manager for Swissport SA he "[e]valuate[d] employee performance annually and continually monitor[ed] performance and [made] evaluations."   (SOF ¶ 4.)

Gamarra, similarly, had the ability to affect changes in the status of employees. For example, Gamarra sent an employee home after he failed to take a direct order from a Lead and complained of dizziness. (SOF ¶ 33.) Gamarra also represented that, while he was a Cargo Supervisor for Swissport Cargo, he controlled staff assignments and managed compensation. (SOF ¶ 30.)

Courts have found such authority sufficient to comport with the regulatory requirement that the executive's recommendations and suggestions be given particular weight. *See, e.g.*, *Lovelady v. Allsup's Convenience Stores, Inc.*, 304 Fed. Appx. 301, 305-06 (5th Cir. 2008) (managers who argued they did not have authority with regard to employment decisions nevertheless satisfied the "particular weight" test where they made recommendations which were almost always followed); *Burson v. Viking Forge Corp.*, 661 F. Supp. 2d 794, 802 (N.D. Ohio 2009) (holding shift supervisors recommendations given particular weight when they initiated disciplinary process by first issuing verbal warning to employees and finding that where a supervisor is "subjected to the close supervision of his superior, courts have routinely found that the supervisors responsible for the daily activities of their subordinates are vested with enough discretionary power and freedom from supervision to qualify for the executive exemption"); *Rainey v. McWane, Inc.*, 552 F. Supp. 2d 626, 632 (E.D. Tex. 2008) (particular weight test met where, among other things, supervisors were responsible for initiating disciplinary process).

Given the Plaintiffs responsibilities and authority over other employees, the fourth prong of the executive exemption is satisfied. Having met all of the factors for the executive exemption, the Plaintiffs are not entitled to overtime compensation, and the Defendants are entitled to the entry of summary final judgment in their favor.

II.    **THE DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT BECAUSE THE PLAINTIFFS ARE EXEMPT UNDER THE ADMINISTRATIVE EXEMPTION OF THE FLSA.**

The Plaintiffs are exempt under the administrative exemption of the FLSA.  To show that an employee was employed in an administrative capacity, the employer must demonstrate that the employee is:

(1)    Compensated on a salary or fee basis at a rate of not less than $455 per week;

(2)    Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and,

(3)    Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

29 C.F.R. § 541.200(a).

A.    **The Plaintiffs Were Paid A Salary Of At Least $455 Per Week.**

As set forth *supra* in Section I(A), the Plaintiffs were paid a salary in excess of $455 per week for all hours worked in a workweek.  Defendants, thus, have met the initial factor of the administrative exemption.

B.    **The Plaintiffs' Primary Duty (Alternatively Or In Addition To Management) Was The Performance Of Non-Manual Work Directly Related To The Management Or General Business Operations Of the Defendants.**

The DOL's regulations instruct that qualifying work includes, but is not limited to:

> [W]ork in functional areas such as tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; labor relations; public relations, government relations; computer network, internet and database administration; legal and regulatory compliance; and similar activities.

29 C.F.R § 541.201(b).  Swissport SA provides fueling services to airlines at MIA.  (*See* SOF ¶ 1.)  Swissport Cargo provides cargo- and mail-handling services to airlines at MIA.  (J. Cabrera Dec. at ¶ 3.)

Laborieux and Lacayo collectively testified that, as Duty Managers, they were responsible for the following non-manual duties: performing safety and quality assurance audits on employees (SOF ¶¶ 10, 14, 16, 20); reporting safety concerns (SOF ¶¶ 16, 18); handling customer concerns (SOF ¶¶ 10, 13, 23, 24); managing the staff (SOF ¶ 10, 16); and, communicating with the fire department (SOF ¶ 10), among other duties.  Laborieux and Lacayo further testified that they were responsible for ensuring that their employees were performing their jobs safely (SOF ¶¶ 10, 14, 16), and adhering to Swissport SA's safety guidelines.  (SOF ¶¶ 10, 14.)  They also created and delivered reports at the end of their shifts providing a summary of issues encountered during the shift for use by the next shift's Duty Manager.  (SOF ¶ 13.)  In sum, Lacayo's and Laborieux's primary duty was to provide "the day-to-day safe and efficient operation of plane fueling activities."  (SOF ¶ 10.)

Similarly, Gamarra represented that, as a Cargo Supervisor for Swissport Cargo, he managed compensation and controlled staff assignments, maintained "safety, security and quality standards," updated "customer manuals, training and documentation," and maintained good relationships with customers and airport authorities.  (SOF ¶ 30.)

In light of the Plaintiffs' own representations, it is clear that their primary work duties were "directly related to the management or general business operations of [their] employer[s] or [their] employer's customers."  29 C.F.R. § 541.201(a).  *See Viola v. Comprehensive Health Mgmt., Inc.*, 441 Fed. Appx. 660, 662–63 (11th Cir. 2011) (per curiam) (holding that an employee who arguably performed four of the functions listed in § 541.201(b) was covered by

the administrative exemption as a matter of law as "it is not necessary that an employee perform all of the functions listed in the regulations to qualify as exempt"); *see also Farnham v. Riimic, LLC*, Case No. No. 12–60153–CIV, 2012 WL 5187851 at * 3 (S.D. Fla. Oct. 19, 2012) (manager qualified for administrative exemption when she performed duties relating to, among other things, personnel management, employee relations and benefits, research, safety and health, insurance, purchasing and procurement, and financial matters).

> **C.      The Plaintiffs' Primary Duty Included The Exercise Of Discretion And Independent Judgment With Respect To Matters Of Significance.**

For an employee to qualify for the administrative exemption, his "primary duty must include the exercise of discretion and independent judgment with respect to matters of significance."   29 C.F.R. § 541.202(a); *see id.* § 541.200(a)(3).   Generally, "the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered."  *Id.* § 541.202(a).  The Plaintiffs did just this on a daily basis.

At their depositions, Lacayo and Laborieux agreed that as Duty Managers, it was their responsibility to "manage and direct staff in the effective execution of their duties and the assistance in solution of problems" (SOF ¶ 10, 16; *see also* SOF ¶¶ 4, 29), and to make sure employees were performing their jobs correctly (SOF ¶¶ 10, 16, 22.)   They explicitly testified that they routinely responded directly to customers (SOF ¶¶ 23, 24); determined whether the company had sufficient workers (*see* SOF ¶¶ 7, 13, 15); called maintenance regarding mechanical problems with equipment (SOF ¶¶ 7, 10); ensured compliance with the airport authority (SOF ¶¶ 10, 14); and, reported safety concerns (SOF ¶¶ 16, 18), among other duties.

Additionally, Gamarra represented that he controlled the staff assignments.  (SOF ¶ 30.) Indeed, he approved overtime for his employees.  (SOF ¶ 35.)  Moreover, Gamarra had the ability to, and did, send employees home.  (SOF ¶ 33.)

Thus, the record establishes the Plaintiffs regularly exercised discretion and independent judgment on significant matters directly related to the management of Swissport's general business operations.  *See Stricker v. Eastern Off Road Equipment, Inc.*, 935 F. Supp. 650, 659 (D. Md. 1996) (administrative exemption test met where store manager, either alone, or with a co-manager, was responsible for the "day-to-day operations" of the store, which included ensuring that the store opened and closed on time, and that customers were satisfied).

Moreover, while Plaintiffs may try to argue that they did not exercise discretion and independent judgment because their supervisors had to approve any decisions or recommendations they made, this argument is unavailing.  Courts routinely have held that while an administrative employee must exercise independent decision-making, the fact that his superiors may review and approve the employee's decisions before they are final "does not disqualify [the] employee from the administrative exemption."  *See Viola*, 441 Fed. Appx. at 664; *see also Farnham*, 2012 WL 5187851 at *4-5.

Accordingly, even if the Plaintiffs did not qualify for the executive exemption, they are exempt as administrative employees, and the Defendants are entitled to summary final judgment.

## CONCLUSION

The record demonstrates conclusively that Plaintiffs were employed in exempt positions and us were properly paid a salary for all hours worked.  Thus, for the reasons set forth above, Defendants respectfully request that the Court grant the instant Motion.

Respectfully submitted,

*s/ Patrick M. Muldowney*
Patrick M. Muldowney
Florida Bar No.: 0978396
e-mail: pmuldowney@bakerlaw.com
Meagan L. Martin
Florida Bar No.: 0089657
e-mail: mmartin@bakerlaw.com
**BAKER & HOSTETLER LLP**
Post Office Box 112
Orlando, Florida 32802-0112
Phone: (407) 649-4000
Fax: (407) 841-0168
**Attorneys for Defendants**

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on December 12, 2016, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to the following:

Christopher F. Zacarias, Esquire
Law Offices of Christopher F. Zacarias, P.A.
5757 Blue Lagoon Drive, Suite 230
Miami, Florida 33126
E-Mail: czacarias@zacariaslaw.com

*s/Patrick M. Muldowney*
Patrick M. Muldowney